**SECOND DIVISION**
**DOYLE, P. J.,**
**DAVIS and WHITAKER, JJ.**

NOTICE: Motions for reconsideration must be received no later than 4:30pm on the 10th day after the decision was issued to be deemed timely filed.
https://www.gaappeals.gov/rules

**August 7, 2026**

# In the Court of Appeals of Georgia

A26A1564. THE STATE v. KIM.

WHITAKER, Judge.

In this prosecution for driving under the influence of alcohol to the extent that it is less safe to drive ("DUI-less safe") and failure to maintain lane, the State appeals from a trial court order granting defendant Je Lag Kim's motion to suppress the results of chemical testing of his breath. The State contends that the court erred in ruling that the arresting officer misled Kim by requesting consent to both breath and blood testing after reading the Georgia statutory implied consent notice. For the reasons that follow, we agree and reverse.

"When a defendant moves to suppress evidence based on an illegal search, the state must bear the burden of proving that the search was lawful." *Leon-Velazquez v.*

*State*, 269 Ga. App. 760, 761(1) (605 SE2d 400) (2004). Accord *State v. de la Paz*, 370 Ga. App. 853, 854 (899 SE2d 447) (2024). See also OCGA § 17-5-30(b). On appeal from a decision on a motion to suppress, where, as here, the relevant facts are undisputed, we review the trial court's legal conclusions de novo. *State v. Jacobs*, 342 Ga. App. 476, 477 (804 SE2d 132) (2017). Accord *Johnson v. State*, 297 Ga. App. 847, 847 (678 SE2d 539) (2009).

The record shows that, around midnight on March 3, 2023, a police officer stopped a vehicle being driven by Kim after he failed to stay in his lane multiple times in short succession. As the officer approached the vehicle — in which Kim was the only occupant — he detected "a strong odor of an alcoholic beverage" coming from its interior and noticed that Kim's eyes were "bloodshot and watery." When asked how much he had had to drink that night, Kim responded, "Two beers."

While Kim agreed to submit to field sobriety testing, the officer ended the testing after, according to the officer, Kim was "unwilling or unable" to perform one of the tests. A portable breath test, however, indicated the presence of alcohol. The officer arrested Kim and, after determining that he was over the age of 21, read him the applicable Georgia implied-consent notice. At the end of the notice, the officer

asked Kim, "Will you submit to the state administered chemical tests of your *breath and blood*?" After a brief pause, Kim responded, "Yes," without elaboration. The officer later testified that he did not believe that Kim had any difficulty understanding him. Chemical testing of Kim's breath revealed a blood-alcohol concentration of more than 0.08 grams.

The State thereafter filed an accusation charging Kim with one count each of DUI-less safe and failure to maintain lane. Kim moved to suppress the results of his breath test, arguing that it resulted from an "unlawful administration of the Georgia implied-consent warning," and thus, his consent to testing "was neither knowing nor voluntary." In particular, Kim contended that, because the officer requested consent for both breath and blood tests after giving the notice, he "could not meaningfully exercise his constitutional right to refuse a breath test which carries no adverse evidentiary consequence while consenting to a blood draw." Thus, Kim asserted, "the officer effectively deprived [him] of the opportunity to choose which test, if any, he would take."

Following an evidentiary hearing, the trial court granted Kim's motion to suppress, holding that the officer's "decision to simultaneously ask for both a breath

and a blood test was potentially confusing to [Kim] in a meaningful way" due to the different evidentiary consequences for refusing to submit to each. The court also concluded that the General Assembly intended for law enforcement "to request one test at a time," reasoning that the statutory implied-consent notice "specifically directs law enforcement to designate the chemical test — not test(s) — to which the driver is being asked to submit." The court suggested that "[t]he better practice" would be for an officer to read the notice once, "ask for either blood or breath, and then proceed with a second reading" if "the officer deemed it necessary to request the other kind of test." The court ruled that under the totality of the circumstances, failing to do so misled Kim "regarding the factors to be considered in deciding whether or not to consent to the chemical test(s)." This appeal followed.

The State argues that simultaneously requesting consent for both blood and breath tests does not invalidate an accused's consent to testing absent evidence of coercion. The State contends that the officer's reading of the implied-consent notice here was not objectively confusing since the notice as read was substantively accurate, explicitly stated the consequences for consenting to or refusing testing, and informed Kim that he could refuse testing.

Subjecting a person to a breath test and collecting blood or urine samples for analysis each constitutes a "search" subject to Fourth Amendment protections when attributable to the government or its agents. See *Skinner v. Ry. Labor Execs.' Ass'n*, 489 US 602, 614–17(II)(A)–(B) (109 SCt 1402, 103 LE2d 639) (1989). A warrantless search is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015). One such exception, valid consent, "eliminates the need for either probable cause or a search warrant." Id. at 821. When relying on this exception, "the State has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances." Id. (quotation marks omitted).

> The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect. The appropriate inquiry is whether a reasonable person would feel free to decline the officer['s] request to search or otherwise terminate the encounter.

*Johnson*, 297 Ga. App. at 849 (quotation marks omitted). See also *Jacobs*, 342 Ga. App. at 480 (quotation marks omitted).

When drivers are arrested for DUI in Georgia, officers ask them to submit to chemical testing; the implied-consent statute prescribes the language officers must use. *Olevik v. State*, 302 Ga. 228, 230(1)(a) (806 SE2d 505) (2017). For drivers aged 21 years or older (like Kim), that language is as follows:

> The State of Georgia has conditioned your privilege to drive upon the highways of this state upon your submission to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to blood or urine testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the requested state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your (*designate which test*)?

OCGA § 40-5-67.1(b)(2). The statute further provides that "the requesting law enforcement officer shall designate which test *or tests* shall be administered initially

6

and may subsequently require a test *or tests* of any substances not initially tested."[1]

OCGA § 40-5-67.1(a) (emphases added).

Importantly, "obtaining consent for chemical testing pursuant to implied consent requirements does not dictate which consented-to test will actually be administered." *Collins v. State*, 290 Ga. App. 418, 420(1) (659 SE2d 818) (2008) (quotation marks omitted), overruled in part on other grounds by *State v. Henry*, 312 Ga. 632, 638–40(3)(c)–(d) (864 SE2d 415) (2021). Thus, "[a]n officer may advise a person of his implied consent rights and request multiple tests at one time[,] and the requesting officer is authorized to decide which test or tests shall be administered." *Nagata v. State*, 319 Ga. App. 513, 515 (736 SE2d 474) (2013) (explaining that an officer does not "change the meaning" of the notice by requesting multiple tests (quotation marks omitted)).

Moreover, when determining whether a suspect's ensuing consent is valid, the government need not establish knowledge of the right to refuse consent "as the sine

---

[1] The trial court misread the statute by concluding that officers must request one test at a time after separate readings of the implied consent notice. The statute speaks in terms of designating the "test or tests" to be administered if consent is given. Nothing in the statute requires duplicative readings of the notice to simultaneously obtain consent for each type of test.

qua non of an effective consent," although such knowledge is "one factor to be taken into account." *Olevik*, 302 Ga. at 251(3)(b) (quotation marks omitted). Instead, whether a suspect voluntarily consented to testing is considered "under the totality of the circumstances," id. at 248(3)(a); accord *Williams*, 296 Ga. at 821–23, including

> the age of the accused, his education, his intelligence, the length of detention, whether the accused was advised of his constitutional rights, the prolonged nature of questioning, the use of physical punishment, and the psychological impact of all these factors on the accused. In determining voluntariness, no single factor is controlling.

*Olevik*, 302 Ga. at 251(3)(b) (quotation marks omitted). "[T]he determinative issue with the implied-consent notice is whether the notice given was substantively accurate so as to permit the driver to make an informed decision about whether to consent to testing." Id. at 481–82.

As suggested by the notice's text, refusing a blood test has different evidentiary consequences than refusing a breath test. Compare *Elliott v. State*, 305 Ga. 179, 180 (824 SE2d 265) (2019) (a refusal to submit to breath testing is inadmissible against an accused at trial because it implicates the state constitutional right against compelled

8

self-incrimination)[2], with OCGA § 40-5-67.1(b)(2) (providing that the "refusal to submit to blood or urine testing" may be admitted against a defendant at trial), and *State v. Dias*, 321 Ga. 261, 263–64 (914 SE2d 291) (2025) (the state constitutional right against compelled self-incrimination does not bar the admission at trial of a suspect's refusal to submit to blood testing). But while refusal is an option with varying consequences, "knowledge of the right to refuse consent is only *one factor* to be taken into account, and the State need not demonstrate such knowledge as an absolute requirement to show effective consent." *Jacobs*, 342 Ga. App. at 482. Moreover, "a defendant's affirmative response to the implied consent notice may itself be sufficient evidence of actual and voluntary consent, absent reason to believe the response was involuntary." *State v. Clay*, 339 Ga. App. 473, 475 (793 SE2d 636) (2016) (quotation marks omitted).

Here, "considering the implied-consent notice as a whole and without isolating the final question," the notice as read to Kim "made clear that he had the right to refuse testing." *Jacobs*, 342 Ga. App. at 482. The notice also accurately informed Kim that, if he refused any testing, his Georgia driver's license or privilege to drive on

---

[2] See Ga. Const. of 1983, Art. I, Sec. I, Par. XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating.").

9

Georgia highways would be suspended for at least a year and that a refusal to submit to blood or urine testing could be offered into evidence against him at trial. See OCGA § 40-5-67.1(b)(2). Thus, the notice indicated both that refusal was an option, see *Jacobs*, 342 Ga. App. at 482 (informing a suspect of the consequences for refusing testing shows that refusal is an option), and that different consequences may flow from refusing different tests. And "the officer read the implied-consent notice verbatim with no further comments, threats, or coercion," Kim "appeared to understand and answer the officer's questions appropriately," and there was no evidence of any impairment to Kim's ability to consent. Id. at 483.

While the trial court was apparently concerned that requesting consent to both breath and blood testing at the same time required Kim to either consent to or refuse both, nothing in the record establishes that Kim was confused or believed that the consent was "all or nothing," and nothing in the notice as read here prevented Kim from consenting to one type of testing while refusing another. See *Nagata*, 319 Ga. App. at 515 (explaining that an officer may "request multiple tests at one time").

Finally, read as a whole, asking for consent to both breath and blood testing at the end of the statutory notice is not materially different than asking for consent to

10

only breath testing immediately after informing a suspect of the administrative consequences of refusing all testing and the evidentiary consequences of refusing blood and urine testing. See generally *State v. Young*, 339 Ga. App. 306, 311–12 (793 SE2d 186) (2016) ("[T]here is no unlawful coercion where . . . the officer merely informs the arrestee of the permissible range of sanctions that the State may ultimately be authorized to impose." (quotation marks omitted)).

The State met its burden of showing valid consent. Asking for both tests did not render Kim's consent to the breath test involuntary. See *Jacobs*, 342 Ga. App. at 480–82 (concluding that a suspect's consent to a breath test was not involuntary where the arresting officer failed to designate the test to which consent was sought); *Jones v. State*, 319 Ga. App. 520, 521–24 (737 SE2d 318) (2013) (affirming the denial of a motion to suppress breath-test results where the officer listed the chemical tests available and requested and obtained consent to a blood test, but the defendant ultimately submitted to a breath test); *Nagata*, 319 Ga. App. at 514–16 (holding that an officer's failure to specify the test for which he was requesting consent did not invalidate the defendant's consent to a breath test where, as here, the officer informed the defendant of the different tests available, including a breath test, as "[t]he notice

11

given was sufficiently accurate to permit [the defendant] to make an informed decision about whether to consent to testing" (quotation marks omitted)); *Collins*, 290 Ga. App. at 419–20(1) (holding that the notice given was sufficiently accurate to permit the defendant to make an informed decision about whether to consent to chemical testing when the officer listed all of the tests available and allowed the defendant to choose which test to take). See also *Jacobs*, 342 Ga. App. at 482–83 (emphasizing that a court "must consider *all* of the circumstances" surrounding a suspect's agreement to submit to a breath test "because no single factor controls").

Kim's argument that our decisions in *Jacobs*, *Nagata*, and *Jones* pre-date the distinctions between the evidentiary consequences for refusing to submit to different tests is unavailing, as the determinative standard in those decisions — whether the implied-consent notice was substantively accurate so as to permit the driver to make an informed decision about whether to consent to testing — remains good law and applies in this case.

*Judgment reversed. Doyle, P. J., and Davis, J., concur.*